The next case on calendar is Mestre v. Vivendi Universal. As I was saying, my name is Michael Manahan. Along with my wife, Yvonne Mestre, we're the plaintiffs in this copyright case. It involves our film project entitled The Sunday Hat and defendants' project entitled Billy Elliot. The case comes to this court after the district court granted defendants' motion for summary judgment, having ruled in defendants' favor on both the issues of access and substantial similarity. Knowing that the court's aware of the facts, I'll immediately address the issues of access and substantial similarity as they apply to our case. Regarding access, at our depositions, my wife testified that she handed a promotional film of our story directly to defendant Lee Hall, who is the alleged author of the Billy Elliot screenplay. And that's the conclusion, but the factual basis for it seems somewhat thin. This is somebody she didn't know at the time? Didn't she recognize him from something nine, many years later? And has it been deduced that it was Mr. Hall? Yes. Seven years after she delivered that tape, heard the instructions of defendant Pippa Hall, who we had met with the prior day, when we discovered the Billy Elliot film and saw the similarities between it and our project, we began to investigate it to see who these people were that made this film. Now, you were in Los Angeles. At this moment, we were actually overseas. Well, no, I'm sorry, when the handover with Pippa. The meeting took place in March of 1994 in Venice, California. Venice, right. We were there, and defendant Pippa Hall and her business associate, D. Gilbert, were all in that area for the AFM film market that they hold each year in Santa Monica. So there was a big meeting of film people. And where was it in Venice? The meeting with them took place at a home owned by actor Larry Hagman in Malibu. Where was the handover? The handover was at a home on the Venice Canals in Venice, California. And this person just came out of the house? As my wife, I wasn't able to get close to the house because it was in a pedestrian area. It's tough to park down there, right. And my wife approached the address that she'd been given, and as she approached the residence, a man came out and asked, is that the tape for Pippa? And she handed the tape to him. Okay. And no names were exchanged? No names were exchanged. All right. So at any rate. That Hall is not related to Pippa Hall? No, the two of them are apparently unrelated. Okay. At any rate, under Anderson, we think that we have the right to have this testimony believed and that it does create a fact issue, coupled with the fact that Mr. Hall hasn't been forthright about his whereabouts during that relevant time. In his depositions or in his interrogatory answers, he makes no mention whatsoever of having resided in the U.S. Yet in the published Billy Elliot screenplay that both defendants and we entered into evidence, speaking in the first person, Mr. Hall says that in the mid-1990s, he spent several years in the U.S. and that it's there that he began to write. Further, in the production notes for Billy Elliot that is entered into evidence, it says that the idea for Billy Elliot came to Mr. Hall while he was residing in the U.S. And so we believe that the fact that he's withholding that information creates a fact issue that requires credibility determinations and the weighing of evidence. Was he asked in his deposition whether he lived in the U.S.? I'm sorry, Your Honor. Was he asked in the deposition whether he lived in the U.S.? Mr. Hall hasn't been deposed. Well, where was he withholding the information? In interrogatory answers. Was he asked in the interrogatory questions? We asked Mr. Hall in interrogatory specifically where he lived during the relevant time period, and he makes no mention of having resided in the U.S. Did that answer the question? Yes, thank you. Thank you. In addition to that evidence, we also presented evidence of two third-party intermediaries, Defendant Pippa Hall and a man named Howard Birch, who represented First Film Foundation, which is an organization we had solicited submission to prior to Mr. Birch and Mr. Hall participating in a residential writer's retreat, I think they call it, for aspiring filmmakers. And I think that in our brief we established that a sufficient nexus between the two exists. We also established that a sufficient nexus between Pippa Hall and Lee Hall exists. However, the district court found that that nexus occurs at a later date than we suggest that it did. We believe that Pippa Hall and Lee Hall knew each other prior to 1998, and that, again, it was a factual issue that credibility determinations and the weighing of evidence play a role in because Pippa Hall has denied having ever met with us, she denies having requested a business meeting with us, and she denies having received our materials. So we believe that these defense witnesses aren't being forthcoming and giving the court information that could be useful in coming to its conclusion. Therefore, we believe that summary judgment on the issue of access is precluded. Regarding substantial similarity, we've presented a number of similarities between the Sunday hat and Billy Elliot that we think go far beyond abstract ideas. This court in Etz Hocken v. Sky Spirits articulated that the very essence of copyrightability is the artistic expression within a work. That said, we have to decide whether or not the similarities we've proffered are ideas or expression. Well, in Croft, this court gave a useful tool that's quite simple, and that is in describing a work, if the expression doesn't add anything to the idea, then it's simply an idea. But if the expression adds to the idea creatively, then it's expression and therefore protectable. Well, we believe that a reasonable jury, properly instructed, would look at the similarities that we've proffered and come to the conclusion that they are far more than abstract ideas. Okay, so what are they specifically? Because you know the extrinsic test gives us the six criteria. So what specifically are they? Well, for example, using the idea-expression dichotomy, the manner in which the lead is introduced to ballet. The abstract idea is the poor child is introduced to ballet. That could be expressed in limitless ways. There's unlimited creative expression available to the author. My wife expressed it by having the young child accidentally stumble upon a children's ballet class by mere chance. In Billy Elliot, Mr. Hall could have done it a number of ways, and we pointed out the various ways he could have introduced that character to ballet. But he used the exact same elements in the same order to express the idea similarly. Billy stumbled by chance upon a children's ballet class, and that was the introduction. Similarly, the way that the parent finds out that the child is secretly participating in ballet also goes far beyond an abstract idea. If the abstract idea is that the parent discovers the child's participation, we pointed out in our brief any number of ways that can be expressed. But in both stories, an adult tips off the parent. The parent unexpectedly shows up at the ballet class. The child is shocked to see the parent there. The narration describes in both stories that the teachers are confused by what's going on. The parent has a fit of anger, causing a scene in front of everyone. And ultimately, the parent and the child exit, and the ballet class continues as if nothing's happened. Now, applying the idea-expression dichotomy, objectively, that has to be considered expression, and yet it appears in both works. Now, regarding the amount of copying necessary to find copyright infringement, this court has long held that the amount needn't be great, provided what's been taken is essential to the original story. And we submit that by taking the essential sequence of events that we outlined in our brief, Mr. Hall stole the heart and soul of the Sunday hat. And taking it a step further, if one were to remove every similarity between the two works, there'd be nothing left of either story. Now, the defendants have argued that the dissimilarities are really what matters here, and that reasonable jurors couldn't conclude that the two works are the same. But this is a misapplication of the substand of law at summary judgment. At summary judgment, what matters is if protected expression has been taken from the original work and duplicated in the accused work. Now, if that amount is great or small, once it has been found that there is copyright infringement and protectable expression has objectively been taken, the inquiry goes no further. It's left to a jury to perform the intrinsic test. Are you familiar with the recent Ninth Circuit case, Funky Films? I read that case. I was just struck by what I thought were the similarities in fact pattern between your case and that. Could you distinguish? And, of course, as you know, they found no copyright infringement in that. Yes, I'm familiar with that case. I've read the opinion. And without knowing if the plaintiffs, how they argued the similarities were there, they may have had random similarities in pattern throughout the case. And since Litchfield, that isn't sufficient to show substantial similarity. However, I would distinguish our case. Two scenes that I just described, in their entirety, structure of it is identical. But there are differences in those scenes as well. Well, there are some differences. However, nonliteral copying can be copyright infringement. We have argued in this case that there is a fragmented literal similarity where what is appearing in the Sunday hat is virtually identical in Billy Elliot. For example, when the kids are hiding their ballet items under the mattress or when, in exasperation, the child slides down into a seated position. I mean, there's little literary fingerprints that show up throughout Billy Elliot. But there's also, in addition to the fragmented literal similarity,  and that can be copyright infringement. It's near-identity duplication. And so I would submit that, at least at summary judgment, the objective similarities, the concrete similarities, do exist. Judge Berzon, I'm sorry. We can hear everybody. Yeah, I'm trying. I'm trying to be as... Put it on mute. Okay. All right. Just to summarize the answer to your question, I would distinguish this from funky films. As best I can, without having been privy to the briefs and whatnot in that case, I believe that in our case there are concrete examples of expression that appear in our story and have been taken in Billy Elliot. And I believe that that satisfies the extrinsic test in this case. Unless there's questions, further questions, I'd like to reserve the rest of the time. Sure. Judge Berzon, do you have any questions? No, that's fine. Thank you. Okay. We'll hear from your opponent. Good morning. May it please the Court. I am Louis Petrich. I'm appearing for the defendants. I wanted first to note that I'm not going to talk about the implied-in-fact contract case against Pippa Hall because that was not raised in the briefs by either side. I'll discuss first the substantial similarity issue because if the Court determines that there is no substantial similarity of protected expression, then the access or actual copying issue is irrelevant. As far as the substantial similarity question goes, as Judge Barzilay noted, funky films is right on point, and it follows a long line of cases. It includes the Litchfield case, which is the E.T. case, the Coma case, Berkik. There are a long line of KOUF, K-O-U-F, is a Disney movie, a long line of cases that points out that where you're talking about similarities that are not literal, but non-literal, the nature of the case is different than just a piracy case. You're talking about whether the plaintiff has protection in structure and whether or not the defendant has copied that structure. In order to determine that, you have to look at both the similarities and the dissimilarities to get an overall picture of whether the structure has been taken. Obviously, once you decide that enough has been taken, there's infringement. You don't have to go any further. Then other dissimilarities don't matter. But you have to determine whether the dissimilarities are such that the overall impact is that the works are just not the same works with immaterial variations, because that's, after all, what the substantial similarity test is about. It's meant to cover those cases where the plagiarist has just made immaterial variations and hasn't come up with something of their own. Now, when you apply that test here, it's very clear that the and you apply the eight factors of the extrinsic test, the themes are somewhat alike. In both of them, you have... Well, what about the ones he cites? He's given us his best examples today. I know there are others. I'm not ruling out the others, but let's focus on the... I have a problem with some of these because they're just factually incorrect. First of all, in his story, Nicky doesn't accidentally stumble into a class for ballet. She sees two of her schoolmates wearing tutus, and she follows them to a building that has a sign on the front that says ballet class. So she didn't just stumble into anything. It's quite a different expression in our movie, where the little boy is at his boxing match at a gym, or a boxing hall, they call it in Britain, and he's told, here, you take the keys and give them to this class over here of ballet instruction when they're done with their ballet class. It's a different expression. He talks about, for example, the parents discover that the children are secretly taking ballet classes. Well, that's the gist of the stories. You're talking about, in both cases, a very simple plot of a young person who wants to take ballet secretly. Different reasons. She's doing it, in their case, because her mother is totally opposed to it, because her mother apparently was not a very good dancer, and as a result her marriage broke up, and she doesn't want that to happen to her child. In our case, Billy feels the social pressure of being what he considers to be something unmanly, and he's concerned. It couldn't be more dramatic. He's there to learn boxing, and he decides he wants to try ballet. So it's quite a different expression. Of course, in that kind of a story, you have to have the parents discover them, and it's not unusual that they would be discovered while they're dancing. There are other ways they could have, I guess. It comes very close in their case, because Nikki has to forge documents in order to take classes, and the forgery comes to the attention of the teachers, and the mother finds out about the forgery. She just doesn't put two and two together. What did you mean, it comes close? I'm sorry? You said it comes close. What comes close? Oh, I'm sorry. It turns out that the mother almost found out about her daughter taking lessons without actually going to the class, because she found out that the daughter had been forging documents, and one of the documents was a note back to the teacher about some lessons that she hadn't taken care of in her homework, but she had also forged another document to the dancing instructor saying that it would be okay for her to take lessons. Yeah, no, I understand that. I just didn't understand which meant came close. So, and then such things as young kids hiding things at home. Well, where would they hide them? Hiding things under the mattress is not that unique an idea, and when you look at the Billy Elliot movie, he doesn't have very many hiding places. That bedroom is about the only place he has that's secret. Let me talk about the access issue. On the issue of access, I just want you to address one specific fact. I'm really troubled by the fact that Mr. Birch, Mr. Hall, and the Billy Elliot executive producer, Ross, were together at the 1995 PAL lab. Why doesn't that constitute enough inference of access to go to the jury? I'm sorry, they worked together where? They were together. There's evidence in the record that all three of these people were together in 1995, and I'm just troubled by the fact that it seems to me that that's enough of an inference of access to at least go to the jury. I'm missing something. All three of which people? Okay, Mr. Birch, Mr. Hall, and the Billy Elliot executive producer, Ross. There's evidence in the record that they were together, and I believe in England at the 1995 PAL lab. It's a screenwriters' conference. That's where you would see screenwriters. I mean, it's like saying that they met at the writers' guild. That's just not enough under our case law. You have to show that the person who has the script is either supervising these other two people or that he's working on the same project with them, or they have some reason to give them this script. First of all, we have no evidence that Birch had that script. All they've got is that they have a letter that they sent to someone other than Birch. That's ER-182 to someone named Angelina McFarland. By the way, the only people deposed in this case were the plaintiffs. There are no depositions of any of the defendants. Were there requests? No. The ER-182 is a letter from Yvonne Mestre and Michael Manahan to Ms. McFarland enclosing their script in 1994. In 1995, Mr. Birch, who says he works with that group, says he never heard of that script, never heard of them, went to a conference where he was one of eight speakers. He spoke for five to ten minutes. He didn't know that Lee Hall was there. He didn't know Lee Hall. He only found out when we called him and told him about it in this case. It's in his declaration. And he said all that happened is that this was one of these seminars where people who are in the business tell other people what they should do to help their careers. And he said there was nothing said about any particular script. He wasn't handing out scripts. It would have been inappropriate for him to do it. And he never heard of the plaintiffs or their script. Why shouldn't the jury hear that, though? Because under our case law, that's not enough. That's speculation and conjecture. A person like Mr. Birch might come into contact with hundreds of scripts. That means that everybody, like Typhoid Mary, everyone he talked to then would somehow have a trial ahead of them if they ever got a picture made. What about, however, the evidence that she said she handed to this person, the script to a person who she strongly believed was Mr. Hall, plus the evidence that Mr. Hall seems to have been somewhat contradictory about where he was during that time period? Why wouldn't that be enough to go to a jury? Your Honor, I'm glad you asked that question. Okay. Now answer it. The statements in the briefs are entirely false and misleading. First of all, one of the... The first one isn't false. She did say that she believed it to be him. Well, here's what she said. I asked her, what did the man look like? Answer, he was not very tall, broad shoulders, young, a younger man dressed in black. That's the physical description. This is a description made over seven years after she met this guy for about five minutes. Never asked his name. He never told his name. But more importantly, what they've left out, is they filed two complaints in this case. And in the first amended complaint, here's what she said. This is the excerpt of Record 8. It says she dropped the copy of the trailer off the following day. Quote, Mestre handed the tape to a man who came outside and asked if she had a tape for Kippa Hall. That man looked strikingly similar to Lee Hall. End quote. Well, now we've got strikingly similar. We've got a guy who's tall, not too tall, and has broad shoulders and is young, and a guy that she says she feels strongly, years later, that that was him. And on the other hand, you've got evidence that the man was never in California. Now they say, oh, but the way we get around that is he misled us in his answers to interrogatories. Well, his answers to interrogatories are as follows. Remember, this is what happened on March of 1994. His answer, this is at ER 360 and 361. His answer to the question, where did he reside, he said, from 1991 to 1999, I lived permanently, and I'll shorten it, in London. And then he says, in 1994, I spent three months at 675 Hudson Street, New York City, New York, where I stayed with my friends. And then in answer to interrogatory seven, where he was asked, which cities and states were you in, number one, New York City, New York City, on several occasions between 1993 to the present. Well, that's not a person who's lying about being in the United States. He's telling exactly what happened. But why doesn't this all go to the jury, in the sense that she did say, continued to say, that she believed that this was the person, and you have all this evidence that she was inconsistent and that he wasn't there and so on. Why isn't it just a jury question? Because a jury has nothing to go on. All they could do is speculate and conjecture about whether or not somebody was in California when she said, I handed something to a man that now I think might have been him. What would they base it on? Whether they believe her, whether they believe that she has good perceptive abilities, whether they believe that the picture in Seven Years Later fits her description, whether they believe these credit card receipts, or whether there's some attack on the credit card receipts has not really been signed by him. Things that juries decide. Well, usually juries have to have a reason to believe that a credit card receipt is not authentic, that there's no foundation, it was never challenged in the summary judgment proceedings. And none of this evidence was challenged, except the challenge that we heard about in the brief is a misstatement of what's in the record. Does that matter? I mean, if she had said definitively, if she had said, this was the same person, I'm sure of it, as opposed to, I strongly believe, would that change anything? In light of the evidence that is uncontradicted that he wasn't there, I think it wouldn't add much to it, but it does show us that, together with the way she answered, or the way she stated it in the complaint, that there's a doubt in her mind of whether that was him. And if there's a doubt in her mind, what in the world would a jury, how would a jury guess? Given our summary judgment standards, are you aware of any case in which there was evidence of this kind, even if contradicted, where summary judgment was upheld? It could be squarely contradicted. That's the reason you go to the jury. Well, I must say, I don't know of any case in an access case where someone said, I handed it to Joe, and Joe said I wasn't there. That's about as close as we can get to this example. I guess I would say that if we were, certainly it wouldn't, it doesn't seem to me, it would pass muster in an ID or in a lineup. It says, I strongly think that's him, and it's strikingly similar. That's a reasonable belief. I mean, a beyond reasonable doubt standard. If I could, just one other thing. The plaintiff says, he misquotes the district court as saying that there was inferential evidence of untruthfulness by key defense witnesses. What he's quoting at ER 101, small b, close paren, is not the decision on summary judgment. This is the decision after we move for attorney's fees. And the judge was trying to dispel the notion that the plaintiff's brought this case with malicious intent. So what you're saying is we can't look at that and say, well, there may be some reason to second guess the summary judgment verdict? Well, no, no. What I'm saying is he relies on that to suggest that the trial judge thought that there was something wrong with the evidence. What he did is he left out the next line. While those inferences were somewhat speculative, they became part of the larger motivation for the suit. This conclusion weighs against the court awarding attorney's fees. And earlier in that paragraph, the court says, because of this, he attributes all this to an unsophisticated understanding of copyright protection and upon that obsessive conviction that some composers and writers have that all similarities must be ascribed to plagiarism. So all he was doing is he's saying, OK, I can understand how initially they may have thought there was something funny going on. But those inferences are speculative. And in any event, Your Honor, because there is no substantial similarity of protected expression, the issue of copying is not relevant. And I wish I had more time to talk about the inverse ratio rule, but we'll submit on our brief. That's in the brief. We don't rely entirely on oral argument. Regarding the dispute over Lee Hall's whereabouts, I'm looking at ER 679, written in the first person in the published Billy Elliot screenplay. His direct quote down at the second paragraph is, In the mid-90s, I spent several years in America, and it was there that I started to write. I don't know how any reasonable person can read that and find any ambiguity in it or come to the conclusion that several years is an occasional visit to New York or to visit friends. I would read that, and I would come to the conclusion that spending several years in America means he was residing. As far as Mr. Petrich's comments regarding what's necessary in a story, they did invoke the sense of fair doctrine, which says that elements of a story that are deemed absolutely obligatory to such treatment of a given theme, those don't count towards expression. However, it's a matter of line drawing. What is necessary? He tried to contradict our example of the parent discovering the child, and he says, well, of course the parent discovers the child. He had to. No, he didn't. You could write a story about a poor child who wants to be a ballet dancer any number of ways. As a matter of fact, it's very peculiar that Mr. Hall, despite having had both of his parents growing up, chose to eliminate one parent like we did and that the only fact you know about that missing parent was that they played an instrument. Now, that goes beyond coincidence, and it isn't necessary. So I would just submit to the court that many of the similarities that one might be tempted to just throw out as sanitaire or unprotectable, the court should ask, is it really necessary in a story like this, with infinite creative expression available to the authors? This court has long held that literary works like screenplays are afforded the broadest scope of protection, and therefore exact duplication or near identity is these types of cases, it's the least necessary to find copyright infringement. And we submit that all of these odd similarities that aren't necessary to the story are simply literary fingerprints left behind that tend to suggest that Mr. Hall used the Sunday hat as a blueprint for his adaptation rather than resorting to his own imagination, which there's evidence in the record where Mr. Hall flat-out states that he's only one time in his life sat down and written something from his own imagination. I think the totality of the evidence here, coupled with defense witnesses who haven't been forthcoming, including Pippa Hall, which we don't really have time to get into her third-party intermediary story, but the handover of the materials to Mr. Hall was at the house she was residing at, and again, now she claims that at the time she didn't meet with us, she said she wasn't a casting associate, and yet she cast the lead role in the film that we're accusing. So all of this just simply doesn't add up, and we feel like, at a summary judgment, we deserve to have this go to a jury and let them make the credibility determinations and let them weigh the evidence, and I think that reasonable jurors, properly instructed, could view it in our favor. Thank you very much. Thank you. The case has been well-argued by both sides, and we appreciate that. The case is submitted.  Would you like a break? Yes. No, that's okay. Go ahead.
judges: Fisher, Berzon, Barzilay